J. S21033/19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  J.E.J., JR., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.M., MOTHER | : | No. 3379 EDA 2018 |

Appeal from the Order Entered October 24, 2018,
in the Court of Common Pleas of Philadelphia County
Family Court Division at No. CP-51-DP-0001123-2015

| | | |
|---|---|---|
| IN THE INTEREST OF:  D.J., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.M., MOTHER | : | No. 3387 EDA 2018 |

Appeal from the Order Entered October 24, 2018,
in the Court of Common Pleas of Philadelphia County
Family Court Division at No. CP-51-DP-0001124-2015

| | | |
|---|---|---|
| IN THE INTEREST OF:  M.L.J., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.M., MOTHER | : | No. 3415 EDA 2018 |

Appeal from the Order Entered October 24, 2018,
in the Court of Common Pleas of Philadelphia County
Family Court Division at No. CP-51-DP-0002740-2016

| | | |
|---|---|---|
| IN THE INTEREST OF:  J.E.J., JR., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.M., MOTHER | : | No. 3416 EDA 2018 |

J. S21033/19

Appeal from the Decree Entered October 24, 2018,
in the Court of Common Pleas of Philadelphia County
Family Court Division at No. CP-51-AP-0000585-2018

IN THE INTEREST OF:  D.J. , A MINOR   :       IN THE SUPERIOR COURT OF
                                      :              PENNSYLVANIA
                                      :
APPEAL OF: E.M., MOTHER               :           No. 3440 EDA 2018


Appeal from the Decree Entered October 24, 2018,
in the Court of Common Pleas of Philadelphia County
Family Court Division at No. CP-51-AP-0000586-2018


IN THE INTEREST OF:  M.L.J.,          :       IN THE SUPERIOR COURT OF
A MINOR                               :              PENNSYLVANIA
                                      :
APPEAL OF: E.M., MOTHER               :           No. 3442 EDA 2018


Appeal from the Decree Entered October 24, 2018,
in the Court of Common Pleas of Philadelphia County
Family Court Division at No. CP-51-AP-0000587-2018


BEFORE:  STABILE, J., MURRAY, J., AND FORD ELLIOTT, P.J.E.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:              **FILED MAY 14, 2019**

E.M. ("Mother") appeals from the October 24, 2018 decrees entered in the Court of Common Pleas of Philadelphia County, Family Court Division, involuntarily terminating her parental rights to her dependent children, J.E.J., Jr., male child, born in March 2013 ("Child 1"); D.J., male child, born in May 2014 ("Child 2"); and M.L.J., female child, born in November 2016

- 2 -

("Child 3") (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b).[1]  After careful review, we affirm.

The trial court set forth the following:

> [Philadelphia Department of Human Services ("DHS")] became involved with this family on May 12, 2014 when DHS received a General Protective Services ("GPS") report which alleged that Mother and Child 2 tested positive for marijuana at the time of Child 2's birth [];  Child 2 was born at 35 weeks gestation and weighed six pounds and one ounce; Child 2 was in the well-baby nursery with an anticipated discharge date of May 13, 2014; Mother did not have a history of substance abuse treatment and denied any mental health diagnoses; Child 2's Father[Footnote 2] was a support for Mother and resided in the home; Mother had obtained baby supplies; Mother was prepared to care for Child 2; Mother and Father were unemployed; Child 1 resided in the home and was in the care of Paternal Grandmother at the time; Mother and Father did not have a visitation and/or custody agreement for Child 1.  This GPS report was substantiated.  On May 13, 2014, DHS received a supplemental report, which alleged that Mother would not be residing at the address previously provided to the hospital; Mother would be discharged from the hospital on May 13, 2014, but Child would not be discharged until May 14, 2014, after his lab reports were completed.  On May 30, 2014, In-Home Services ("IHS") were implemented by the Community Umbrella Agency ("CUA") for the family.  Mother subsequently entered Caton Village's inpatient drug and alcohol treatment

---

[1] Pursuant to Pa.R.A.P. 513, this court *sua sponte* consolidated these appeals because they involve related parties and issues.  (Order of court, 12/27/18.)

We further note that even though Mother filed notices of appeal of the October 24, 2018 orders that changed each child's goal to adoption, Mother does not challenge the goal-change orders in this appeal.

program with Child 1 and Child 2. CUA later learned that Caton Village staff had concerns regarding Mother's ability to care for Child 1 and Child 2 due to her untreated mental illness.

[Footnote 2] Father is not involved in this appeal.

On July 2, 2014, an initial Single Case Plan ("SCP") was created. Mother's objectives were to work with housing specialists at Caton Village to complete the housing package; remain at Caton Village until she was successfully discharged; comply with the program rules and submit clean drug tests; attend parenting classes at Caton Village as well as outside resources; attend Parent Cafes to enhance parenting skills; and attend all mental health appointments.

On December 16, 2014, Mother, Child 1, and Child 2 began residing at Bridges transitional housing and Mother was to attend intensive outpatient treatment. CUA later learned that in late December 2014, Mother was written up by Bridges' staff for lack of food in the home and poor hygiene of Child 1 and Child 2. Subsequently, Mother informed CUA that she, Child 1, and Child 2 were leaving Bridges on January 3, 2015, and would be residing with a family friend ("Friend").

Mother provided CUA with Friend's address. On January 3, 2015, DHS visited the home of Friend but there was no answer. Between January 3, 2015, and January 23, 2015, DHS made several unsuccessful attempts to visit the family.

On January 20, 2015, the SCP was revised. Mother's objectives were to work on completing applications for housing agencies; remain at Chances until she was successfully discharged; comply with the program rules and submit clean drug tests; attend Parent Cafes to enhance parenting skills; comply with Assessment and Treatment Alternatives ("ATA") recommendations from the parenting capacity evaluation ("PCE"); attend all mental health appointments; complete her application for the Community College of Philadelphia

("CCP"); and follow all necessary steps to begin school.

On January 28, 2015, CUA visited Friend's home, met with the family, and completed a home evaluation. Mother showed CUA the room where she stated that Child 1 and Child 2 slept, and CUA learned that Mother resided in the basement of the home. CUA observed that the basement was cluttered and cold, with two exposed hot water heaters. On February 1, 2015, CUA learned that Child 1 and Child 2 were sleeping in the basement with Mother. CUA advised Mother that it was unsafe for the children to continue sleeping there.

On February 16, 2015, Friend contacted CUA and stated that she no longer wanted the family to reside in her home. On February 17, 2015, CUA visited Friend's home. Mother stated that she did not want to enter the shelter system with her family and Friend agreed that the family could remain in the home until alternate housing was located.

On February 24, 2015, CUA made an unscheduled visit to Friend's home. CUA learned that Mother was noncompliant with outpatient drug and alcohol treatment and that she was not engaging in mental health treatment. Mother denied that Child 1 and Child 2 were sleeping in the basement; however, at every home visit, Mother and the children had been located in the basement. CUA discussed the importance of making the children and herself available for weekly meetings with Mother and she gave CUA multiple excuses as to why she had not been available.

On March 8, 2015, DHS observed Mother, Child 1, and Child 2 entering a home with known drug activity. On March 9, 2015, DHS visited the home. An unknown female answered the door and stated that Mother was sleeping upstairs. The woman left to retrieve Mother; however, she returned and stated that Mother was no longer in the home. On the same day, Maternal Grandmother contacted CUA and stated that Mother

did not reside at that home and that Mother was only visiting friends at that location. Maternal Grandmother provided CUA with a current address for Mother.

On March 9, 2015, CUA visited Mother, Child 1, and Child 2 at their new residence. CUA learned that the home belonged to Maternal Great-Grandmother, who was not present at the meeting. CUA observed that the home was appropriate for the children and that they appeared safe. Mother denied living at the other home, despite CUA advising her that she had been observed using house keys to unlock the door and entered the home. CUA informed Mother that she needed to re-engage with outpatient services and discussed safe sleeping for the children. CUA reminded Mother of the team meeting scheduled for the following day. On March 10, 2015, Mother failed to attend the CUA team meeting. CUA made numerous unsuccessful visits to Maternal Great-Grandmother's home. Maternal Great-Grandmother denied access to the home, but stated that family continued to reside in the home.

On May 5, 2015, an adjudicatory hearing was held for Children. Mother was present for this hearing. CUA had been unable to assess Child 1 and Child 2's safety since March 9, 2015; Mother has a history of drug use; Mother last attended Chances outpatient treatment program in late December 2014; Mother has been diagnosed with depression and post-traumatic stress disorder ("PTSD"), but was not engaged in mental health treatment; and Mother lacked stable housing. The trial court adjudicated Child 1 and Child 2 dependent and committed the children to DHS. Mother was referred to the Clinical Evaluation Unit ("CEU") for a dual diagnosis assessment, a forthwith drug screen, and monitoring. Mother was also referred to the Achieving Reunification Center ("ARC") for life skills and parenting. Mother was ordered to complete a PCE.

On August 25, 2015, a permanency review hearing was held for Child 1 and Child 2. Mother was not

present for this hearing. It was reported that Mother had been released from prison and Mother had not been in contact with DHS or the agency worker. The trial court referred Mother to the CEU for a forthwith drug screen, an assessment, and three random drug screens prior to the next court date.

On September 17, 2015, the SCP was revised. Mother's objectives were to work on completing applications for housing agencies; attend the CEU for an assessment; follow all recommendations from the CEU; complete three random drug screens; attend Parent Cafes to enhance parenting skills; comply with ATA recommendations from the PCE; attend ARC for parenting, housing, and employment services; attend weekly supervised visitation with Child 1 and Child 2; attend BHS for an assessment and follow recommendations; complete the application for CCP; and follow all steps necessary to begin school.

On November 24, 2015, a permanency review hearing was held for Child 1 and Child 2. Mother was present for this hearing. It was reported that Mother was minimally compliant with the permanency plan. The trial court re-referred Mother to the CEU for a forthwith drug screen, a dual diagnosis assessment, monitoring, and three random drug screens prior to the next court date.

On February 22, 2016, a permanency review hearing was held for Child 1 and Child 2. Mother was present for this hearing. The trial court referred Mother to the CEU for a forthwith drug screen, monitoring, and three random drug screens. The trial court also referred Mother for a PCE. Mother's forthwith drug screen was positive for marijuana and creatinine was 91 mg/dl. On March 22, 2016, Mother failed to attend the scheduled CEU assessment.

On May 8, 2016, the SCP was revised. Mother's objectives were to work on completing applications for housing agencies; attend the CEU for an assessment; follow all recommendations of the CEU; complete three random drug screen; comply with ATA

recommendations from the PCE; attend ARC for parenting, housing, and employment services; attend weekly supervised visitation with Child 1 and Child 2; attend BHS for an assessment and follow their recommendations; and to complete the application for CCP.

On May 17, 2016, a permanency review hearing was held for Child 1 and Child 2. Mother was present for this hearing. The trial court referred Mother to the CEU for a dual diagnosis assessment, a forthwith drug screen, and three random drug screens. Mother's forthwith drug screen was positive for marijuana. On June 7, 2016, Mother did not attend the scheduled CEU assessment.

On August 9, 2016, a permanency review hearing was held for Child 1 and Child 2. Mother was not present for this hearing. It was reported that Mother was non-compliant with the permanency plan and Mother missed six scheduled visits with Child 1 and Child 2 since the last court date. The trial court discharged the commitment to DHS and ordered DHS to supervise. The trial court reunified the children with Father.

On November 17, 2016, Mother gave birth to Child 3. On November 19, 2016, DHS received a GPS report regarding Child 1 and Child 2 while they were in Father's care. On December 2, 2016, DHS visited the home where Mother, Father, and Children were present. Father indicated that Mother and Child 3 began residing in the home following their discharge from the hospital in November. Child 1 and Child 2 were suffering from impetigo, but their rashes appeared to be healing. DHS observed that the home was somewhat dirty, but Mother and Father had obtained the necessary infant supplies for Child 3.

On December 8, 2016, a permanency review hearing was held for Child 1 and Child 2. Mother was present for this hearing. It was reported that Mother was noncompliant with the permanency plan. Mother had not completed the PCE and had not complied with the

CEU. The trial court ordered DHS supervision of Child 1 and Child 2 to stand and ordered DHS to obtain an Order of Protective Custody ("OPC") with police to assist if necessary for all children. On the same day, DHS obtained an OPC and placed Children.

On December 9, 2016, a shelter care hearing was held for Children. Mother was present for this hearing. The trial court lifted the OPC, ordered Child 3's temporary commitment to DHS to stand, discharged Child 1 and Child 2's temporary commitment, and recommitted Child 1 and Child 2 to DHS. Mother was referred to the CEU for a forthwith drug and alcohol screen, a dual diagnosis assessment, and three random drug and alcohol screens prior to the next court date. Mother tested positive for marijuana at her forthwith drug screen.

On December 15, 2016, an adjudicatory hearing was held for Child 3. Mother was not present for this hearing. The trial court adjudicated Child 3 dependent, discharged the temporary commitment, and fully committed Child 3 to DHS. The trial court referred Mother to the CEU for a dual diagnosis assessment, a full drug and alcohol screen, and three random drug and alcohol screens prior to the next court date. Mother was also ordered to comply with the PCE and all SCP objectives and recommendations.

On February 28, 2017, a permanency review hearing was held for Children. Mother was present for this hearing. It was reported that Mother was minimally compliant with the permanency plan and Mother had been discharged from ARC for non-compliance. The trial court ordered Mother to comply with the PCE and to re-schedule the PCE forthwith. Mother was also re-referred to ARC. Mother tested positive for marijuana at the forthwith drug screen.

On March 1, 2017, the SCP was revised. Mother's objectives were to work on completing applications for housing agencies; attend the CEU for an assessment; follow all the CEU recommendations; complete three random drug screens; complete the ARC parenting

class; and to attend BHS for an assessment and follow the recommendations. On May 15, 2017, Mother tested positive for marijuana.

On May 23, 2017, a permanency review hearing was held for Children. Mother was present for this hearing. It was reported that Mother was non-compliant with the permanency plan. Mother was referred to ARC for parenting and housing but did not comply; Mother was referred to the CEU for a dual diagnosis assessment and did not comply; Mother was referred for a PCE, but did not comply; Mother's supervised visitation with Children was inconsistent; and Mother was non-compliant with all SCP objectives and recommendations. The trial court referred Mother to the CEU for a dual diagnosis assessment, a forthwith drug and alcohol screen, and three random drug screens prior to the next court date. The trial court also ordered Mother to comply with the scheduled PCE on May 31, 2017 as well as all SCP objectives and recommendations.

On August 15, 2017, a permanency review hearing was held for Children. Mother was present for this hearing. It was reported that Mother was non-compliant with the permanency plan and Mother had not attended the scheduled PCE. The trial court re-referred Mother for a PCE and to the CEU for a forthwith drug screen, a dual diagnosis assessment, and three random drug screens prior to the next court date. Mother's visits with Children were suspended.

On August 18, 2017, the SCP was revised. Mother's objectives were to obtain stable housing; work on completing the applications for housing agencies; attend the CEU for an assessment, follow all recommendations, and complete three random drug screens; complete the ARC parenting class; and to attend BHS for an assessment and follow all recommendations.

On November 14, 2017, a permanency review hearing was held for Children. Mother was not present for this hearing. It was reported that Mother had been

non-compliant with the permanency plan. The trial court re-referred Mother to the CEU for a drug screen, an assessment, and three random drug screens, when she availed herself.

On December 7, 2017, and January 8, 2018, the SCP was revised. Mother's objectives were to obtain stable housing; work on completing applications for housing agencies; attend the CEU for an assessment, follow all recommendations, and complete three random drug screens; complete an ARC parenting class; and attend BHS for an assessment and follow all recommendations.

Child 1 and Child 2 have been in DHS care [and] have been since May 5, 2015, and Child 3 has been in DHS care since December 8, 2016. Mother has failed to consistently comply with her objectives and comply with court orders throughout the life of the case. Mother has also failed to demonstrate that she is able to safely and appropriately care for Children. Mother's visits were suspended in August 2017 and the visits have never been re-instated due to Mother's failure to engage with her objectives. DHS filed a petition to involuntarily terminate Mother's parental rights and change Children's permanency goal to adoption on July 18, 2018.

On October 24, 2018, the trial court, presided by Judge Joseph Fernandes, held the termination and goal change trial for Children.[Footnote 3] Mother was present for this trial. Mother's Former Counsel stipulated to the facts of the termination and goal change petitions, but not to the veracity. Children were appointed termination legal counsel that reported to the trial court that Children were not mature enough or could not verbalize their wishes to provide an opinion as to whether they wanted to be adopted or reunified with Mother. The trial court found clear and convincing evidence to change the permanency goal to adoption and to involuntarily terminate Mother's parental rights under 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and (b). On November 20,

2018, Former Counsel filed this appeal on behalf of Mother.[2]

> [Footnote 3] In 2018, multiple continuances were granted. On February 13, 2018, the matter was continued because Mother's Former Counsel was not available. On May 1, 2018, the matter was continued because the Assistant City Solicitor was not prepared to move forward with the scheduled termination proceedings. On July 31, 2018, after the filing of the petitions, the matter was continued because there was insufficient service to Mother. The trial court granted the continuance and referred Mother to the CEU for a full drug and alcohol screen, dual diagnosis assessment, monitoring, and three random drugs screens prior to the next court date, when she availed herself. The trial court also indicated that Mother's visits were to remain suspended until she engaged in her objectives.

Trial court opinion, 1/9/19 at 2-8 (citations to notes of testimony omitted).

Mother raises the following issues for our review:

1. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the adoption at, [sic] 23 [Pa].C.S.A[.] § 2511(a)(1)(2)(5) and (8)[?]

2. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving

---

[2] We note that the record reflects that when Mother filed her timely notices of appeal, she simultaneously filed statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Thereafter, the trial court filed its Rule 1925(a)(2)(ii) opinion.

primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by the adoption act, [23 Pa.]C.S.A § 2511(b)[?]

3.  Whether the trial court erred because the evidence was overwhelming and undisputed that [M]other demonstrated a genuine interest and sincere, persistent, and unrelenting effort to maintain a parent-child relationship with her child[?]

Mother's brief at 7.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re Adoption of S.P.**, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." **Id.** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id.** The trial court's decision, however, should not be reversed merely because the record would support a different result. **Id.** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. **See In re R.J.T.**, 9 A.3d [1179, 1190 (Pa. 2010)].

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re M.G.**,

855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

Here, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the trial court's termination decrees pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first

> initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

Here, Mother claims that the trial court abused its discretion in terminating her parental rights under Section 2511(a)(2) because she "has worked towards completing her SCP goal of housing, visitation, mental health and parenting classes"; she has started mental health treatment and "began parenting"; she failed to complete drug and alcohol counseling "because it conflicted with her work schedule"; and she visited regularly with the Children, "provided that she had transportation." (Mother's brief at 14.) The trial court, however, explained that it terminated Mother's parental rights under Section 2511(a)(2), because:

> [t]hroughout the time that the [C]hildren have been in the custody of DHS, Mother's SCP objectives were to attend the CEU, complete a PCE, obtain housing, complete a behavioral health assessment, and attend supervised visits with Children. Mother admitted that these were her SCP objectives and Mother participated in two SCP meetings at the agency. Mother tested positive for marijuana on six occasions between 2016 and 2018. Mother also failed to appear for a scheduled assessment at the CEU on March 16, 2017 and August 15, 2018. On May 22, 2017, the CEU tentatively recommended that Mother would benefit from intensive outpatient dual diagnosis treatment. Mother has not engaged in any drug treatment throughout the life of the case. Mother failed to appear for random drug screens on August 9, 2018, September 5, 2018, and October 19, 2018. Mother admitted that that her drug of choice is marijuana and that she should not be using marijuana. Mother has failed to engage in a dual diagnosis program. Mother admitted that she never entered drug and alcohol treatment and claimed it was because the treatment conflicted with her work schedule. Mother never completed a PCE, even though she was referred on five different occasions. DHS made arrangements to transport Mother, but

Mother never availed herself for the PCE. Mother never completed housing or parenting at the ARC. Although Mother was referred on several occasions, Mother only completed the intake at the ARC, but she never returned. Mother never provided an address for CUA to assess. Mother claimed that she had housing, but CUA refused to assess the home. Mother testified that since July 2018, she is currently living with a relative, but she is trying to move into a shelter. Mother does not have stable housing. Mother also claimed that she completed a parenting class through a shelter, but she did not have any documentation. Mother was unable to provide CUA with any information about her mental health treatment. Mother claimed that she engaged in mental health [treatment], but she did not provide any documentation. Mother's visits with Children have been suspended since August 2017 due to Mother's failure to engage in drug and alcohol, mental health treatment, and exhibiting behavior that poses a safety threat to Children. Prior to the suspension of her visits, Mother was not consistent with the weekly supervised visits with Children. Mother was never able to graduate beyond weekly supervised visits due to her unstable housing, continued drug use, and lack of mental health treatment. Mother claimed that she was consistent with her visits, although she did admit that there were times that she was unable to attend the scheduled visits. Mother has been minimally compliant with her goals. Children need permanency, which Mother cannot provide. Mother has demonstrated that she is unwilling to remedy the causes of her incapacity to parent in order to provide Children with essential parental care, control, or subsistence necessary for his physical and mental well-being.

Trial court opinion, 1/9/19 at 11-12 (citations to notes of testimony omitted).

We conclude that the record supports the trial court's factual findings and that the trial court did not abuse its discretion in terminating Mother's parental rights under Section 2511(a)(2). The record demonstrates that the

conditions that existed upon removal establish repeated and continued incapacity, abuse, neglect, or refusal of Mother that caused the Children to be without essential parental care, control, or subsistence necessary for his physical or mental well-being. The record also supports the trial court's conclusion that Mother continued to lack capacity to parent the Children.

We now turn to whether termination was proper under Section 2511(b). As to that section, our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219, quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 73 A.3d at 268. The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Here, Mother contends that the trial court abused its discretion when it terminated her parental rights under Section 2511(b) because she "should be given therapeutic visits and or Parent Child Interactive therapy so that she could continue to progress and have visitation with the [Children]." (Mother's brief at 16.) Mother's argument ignores the primary consideration under Section 2511(b), which is the developmental, physical, and emotional needs and welfare of the Children, not Mother's needs and welfare.

Mother also claims that the trial court erred in terminating her parental rights under Section 2511(b) because the Children's wishes were never taken into account. (Mother's brief at 16.) This contention is also unavailing. The record reflects that at the time of the termination hearing on October 24, 2018, Child 1 was 5 years of age; Child 2 was 4 years of age; and Child 3 was 23 months old. Appointed legal counsel for the Children informed the trial court that Child 1 "likes where he is" and "seems happy to be where he is" and that he never asked about Mother, but responded affirmatively when asked if he misses Mother. (Notes of testimony, 10/24/18 at 119.) Appointed legal counsel opined that due to Child 1's age, his preferred outcome could not be ascertained. (*Id.* at 120.) Appointed counsel further informed the trial court that Child 2 and Child 3 were not capable of "verbaliz[ing] anything." (*Id.*) Therefore, because the record demonstrates that the Children were too young to express a preference, Mother's contention that the trial court erred

in terminating her parental rights under Section 2511(b) for failure to take
their wishes into consideration lacks merit.[3]

In terminating Mother's parental rights under Section 2511(b), the trial
court explained that:

> Mother's visits with Children have been suspended
> since August 2017 due to Mother's failure to engage
> in drug and alcohol, mental health treatment, and
> exhibiting behavior that poses a safety threat to
> Children. Prior to the suspension of her visits, Mother
> was not consistent with the weekly supervised visits
> with Children. Mother was never able to graduate
> beyond supervised visits due to her unstable housing,
> continued drug use, and lack of mental health
> treatment. Mother claimed that she was consistent
> with her visits, although she did admit that there were
> times that she was unable to attend the scheduled
> visits. Mother has never inquired about participating
> in Children's specialized services or their medical
> appointments. Mother has never contacted CUA to
> inquire about Children's well-being. Mother has been
> minimally compliant with her goals. As the record
> reflects, at the time of the termination trial, Mother
> has not put herself in a position to safely parent these
> Children. Children are currently placed together in the
> same foster home. Child 1 is currently doing well in
> his pre-adoptive foster home with early intervention
> services. Child 1 is bonded with the foster parent and
> the foster parent ensures that Child 1 receives his
> early intervention services and meets his day-to-day
> needs. Child 1 and Child 2 have been living in the

---

[3] Our supreme court has held that it is appropriate for a guardian **_ad litem_** to represent a child's best and legal interests simultaneously in a parental rights termination proceeding when that child is too young to express a preference. **_In re T.S._**, 192 A.2d 1080, 1088 (Pa. 2018) (expressly affirming that "where a child is too young to express a preference, it would be appropriate for the GAL to represent the child's best and legal interests simultaneously."). Despite the young ages of the Children in this case, the trial court appointed a guardian **_ad litem_** to represent the Children's best interests and counsel to represent their legal interests. (**_See_** notes of testimony, 10/24/18, **_passim_**.)

> foster home together and are bonded. It would be disruptive and detrimental to Child 1 if he were removed from this foster home. Child 2 is placed in the same foster home as Child 1. The foster parent ensures that Child 2 attends pre-school and receives his early intervention services. The foster parent provides for Child 2's day-to-day needs. Child 2 views the foster parent as his parental figure. Child 3 has lived in foster care for her entire life. Child 3 entered into the same placement as Child 1 and Child 2 a few days prior to the termination trial. Child 3 has looked to her current and previous foster parent to meet her day-to-day needs. It is in Children's best interest to be adopted and for Mother's parental rights to be terminated. The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship with Mother. Any relationship with Mother is very attenuated. Mother has not seen Children since August 2017. The DHS witness was credible.

Trial court opinion, 1/9/19 at 18-19 (citations to notes of testimony omitted).

Based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under Sections 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/14/19

- 23 -